**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| NICHOLAS TODD HELMAN, | |
| Appellant | No. 3254 EDA 2015 |

Appeal from the Judgment of Sentence Entered June 15, 2015
In the Court of Common Pleas of Bucks County
Criminal Division at No(s):
CP-09-CR-0000343-2015
CP-09-CR-0002950-2014

BEFORE:  BENDER, P.J.E., OTT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED AUGUST 02, 2016**

Appellant, Nicholas Todd Helman, appeals from the judgment of sentence of an aggregate term of 15 to 30 years' incarceration, imposed after he pled guilty and *nolo contendere* in two separate cases to various offenses, including attempted murder, aggravated assault, and criminal solicitation for aggravated arson.  Appellant challenges the discretionary aspects of his sentence.  After careful review, we affirm.

The trial court set forth a detailed recitation of the facts and procedural history of Appellant's two cases.  **See** Trial Court Opinion, 12/3/15, at 1-5.  Herein, Appellant first complains that the court abused its discretion by

_____

[*] Retired Senior Judge assigned to the Superior Court.

sentencing him beyond the aggravated guideline range on several counts, where the "court failed to adequately specify reasons that warranted such an upward departure." Appellant's Brief at 13. The Commonwealth correctly notes that this claim was not set forth in Appellant's Pa.R.A.P. 1925(b) statement and, consequently, the trial court did not address it in its Rule 1925(a) opinion. Accordingly, we agree with the Commonwealth that Appellant waived this particular claim for our review. Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

Appellant also contends that the trial court abused its discretion by imposing consecutive sentences, resulting in an unduly harsh sentence. More specifically, Appellant maintains that the court failed to adequately consider his lack of criminal history, young age, remorse, history of mental health issues, and that Appellant took responsibility for his crimes by pleading guilty/*nolo contendere*. Appellant avers that the court improperly focused only "on the planning involved in committing these offenses, which the [Sentencing] Guidelines have already taken into consideration." Appellant's Brief at 17.

We have thoroughly reviewed the briefs of the parties, the certified record, and the applicable law. We have also examined the detailed and well-reasoned opinion of the Honorable Alan M. Rubenstein of the Court of Common Pleas of Bucks County. We conclude that Judge Rubenstein's opinion adequately disposes of the arguments presented by Appellant, and

fully demonstrates that the court did not abuse its discretion in fashioning an aggregate term of 15 to 30 years' incarceration for Appellant's egregious offenses. Accordingly, we adopt Judge Rubenstein's opinion as our own and affirm Appellant's judgment of sentence for the reasons set forth therein.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/2/2016

# IN THE COURT OF COMMON PLEAS
## BUCKS COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA

v.

NICHOLAS TODD HELMAN

:
:
:
:
:
:
:
:
:
:
:

No. 2950-2014
0343-2015

**Attempted Murder, Aggravated
Assault, Risking a Catastrophe,
etc.**

## OPINION

The underlying facts of the case were undisputed and set forth thoroughly by the Commonwealth during Appellant's guilty and *nolo contendere* pleas and sentencing on June 15, 2015.

Nicholas Helman and Kelsey Evans were in a romantic relationship in 2013. Prior to November 2013, the couple ended their relationship. N.T. 6/15/15, 47. At this time, Nicholas Helman began sending threatening communications via social media to Evans and her new boyfriend, Jacob Palm. N.T. 6/15/15, 48. These threats included a blood-soaked letter. N.T. 6/15/15, 51. In December 2013, Helman communicated to a mutual friend of Kelsey Evans and Helman that he intended to harm Jacob Palm within the next three months. N.T. 6/15/15, 48.

In February 2014, Helman placed online orders for castor beans, sodium hydroxide, and a "scratch-and-sniff" birthday card. Helman also personalized the birthday card, writing, "Sorry for the late birthday. Just was thinking of you. Enjoy (sic)." From these items, Helman created Ricin using a household blender. Ricin, a poison, is fatal if ingested or inhaled. Helman then placed Ricin onto the birthday card and addressed it to "Jacob Palm." N.T. 6/15/15, 48-49.



On March 6, 2014, Helman walked from his home in Hatboro, Montgomery County, to Palm's home in Warminster, Bucks County, a distance of approximately eight (8) miles, and placed the toxic birthday card inside the mailbox at Palm's residence. N.T. 6/15/15, 48, 97-98.

The following day, Helman went to work at Target in Warrington Township, Bucks County. There, he stated to a coworker: "I finally got him." Helman also remarked to a fellow employee that the Ricin would kill anyone who came into contact with the substance "within four days." This employee relayed the conversation to a supervisor at Target, who then contacted the Warminster Township Police Department. N.T. 6/15/15, 48.

The Warminster Township Police Department immediately attempted to contact the Palm family. The police reached Marlene Palm, Jacob's mother, and asked whether she had obtained their mail that day. N.T. 6/15/15, 48-49. At that moment, Marlene Palm's daughter Melinda was retrieving the mail, and already had the toxic envelope in her hands. At her mother's instruction, Melinda Palm immediately returned the envelope to the mailbox. N.T. 6/15/15, 49-50.

After the envelope was recovered, it was submitted for testing to the Federal Bureau of Investigation ("FBI"). The substance inside the card was determined to be Ricin. Additionally, the FBI confirmed that the amount in question would have been fatal had it reached the intended target. N.T. 6/15/15, 50.

The Commonwealth noted that, in addition to the Palms, many other individuals were at risk of coming into contact with this toxin. For example, a postal employee placed new mail on top of the tainted envelope in the Palm's mailbox. Additionally, Helman brought the remaining Ricin to his place of employment at Target and showed it to fellow employees. N.T. 6/15/15, 53, 109-110.

On November 17, 2014, Helman entered a plea of guilty on Information No. 2950-2014. (Attempted Criminal Homicide, Aggravated Assault, Risking a Catastrophe, Stalking, two (2) counts of Terroristic Threats, Simple Assault, Possessing Instruments of Crime, Recklessly Endangering Another Person, and Harassment).

2

Sentencing upon Criminal Information 2950-2014 was deferred pending the disposition of new criminal charges which were filed against Helman.

On May 30, 2014, Deputy District Attorney Antonetta Stancu received a letter form Harry Wallace, an inmate at the Bucks County Correctional Facility. Wallace claimed to have information regarding Helman and his pending case. Stancu also received a letter from Helman, asking that the police speak with Wallace regarding this case. N.T. 6/15/15, 37-38.

Detective John Schlotter of the Warminster Township Police Department met with Wallace. According to Wallace, Helman asked Wallace to access a website in order to gain more information on the previously-targeted victim, Jacob Palm. N.T. 6/15/15, 38.

On July 2, 2014, prison officials at the Bucks County Correctional Facility intercepted a letter from Helman to an acquaintance named "Lexi." In the letter, Helman remarked that he was about to "do something crazy" in order to receive a more lenient sentence. Helman also asked the recipient to destroy the letter after reading it. N.T. 6/15/15, 38-39.

On July 8, 2014, the Warminster Township Police Department received a telephone call from Wallace's mother, informing them that her son had received a letter from Helman which outlined specific and graphic threats against individuals involved in prosecuting the original criminal case. N.T. 6/15/15, 39.

On July 11, 2014, the new allegations concerning this "letter" and Harry Wallace were submitted to the Bucks County Investigating Grand Jury. On July 24, 2014, Helman testified before the Grand Jury that he indeed wrote the letter to Wallace. N.T. 6/15/15, 40-41. In the letter, Helman directed Wallace to seek revenge against those involved in prosecuting Helman's Ricin case. Helman instructed Wallace to kidnap Deputy District Attorney Stancu, and to "rip the bitch's tongue out for spreading lies about [Helman]." N.T. 6/15/15, 41. Helman also requested that Wallace mail the "severed tongue" to him in prison. As for Detective John Schlotter, Helman

3

wanted him kidnapped, and wanted his family removed from their home so it could be burned down. N.T. 6/15/15, 41.

In addition to those involved in prosecuting the case, Helman threatened his two (2) Target co-workers, Rachel Huber and Samantha Heil. According to the letter, he wanted "their eyes to be burned out and their tongues cut off." N.T. 6/15/15, 42-43.

Rebekah Teichmann, a former girlfriend of Helman, and Matthew Lessard, her new boyfriend, were also targeted. Helman wanted Lessard killed in front of Teichmann so that Teichmann would "experience what it's like to lose someone." N.T. 6/15/15, 43.

Helman also threatened Melinda Palm, Jacob Palm's sister, who intercepted the Ricin-laced letter from the family's mailbox. He instructed Wallace to chop of Melinda Palm's hands. Finally, Helman demanded that Jacob Palm be kidnapped and "dealt with later." Although not in the letter, Wallace was verbally instructed by Helman to kill Palm and his entire family. N.T. 6/15/15, 41-42.

On June 15, 2015, Helman entered a plea of *nolo contendere* to Criminal Solicitation of Aggravated Arson and Criminal Solicitation of Aggravated Assault. Helman also plead guilty to nine (9) separate counts of Terroristic Threats.

Helman was sentenced on June 15, 2015 in both cases. As to Attempted Murder, Helman was sentenced to not less than five (5) nor more than ten (10) years imprisonment. As to Aggravated Assault, Helman was sentenced to not less than five (5) nor more than ten (10) years imprisonment, to be served consecutively. For Risking a Catastrophe, Helman was sentenced to not less than two-and-a-half (2 ½) nor more than five (5) years, also running consecutively. For Stalking, Helman was sentenced to not less than two-and-a-half (2 ½) to five (5) year sentence, again running consecutively. Finally, Helman was sentenced to one (1) to two (2) years on each of the remaining counts, all running concurrently to the previous counts. Therefore, upon Criminal Information No. 2950-2014, Helman's aggregate sentence was fifteen (15) to thirty (30) years imprisonment. *See* N.T. 6/15/15, 115-116.

Subsequently, Helman entered guilty and *nolo contendere* pleas on Criminal Information No. 0343-2015. For Criminal Solicitation for Aggravated Arson, Helman received a sentence of not less than two-and-a-half (2 ½) nor more than five (5) years imprisonment. As to Criminal Solicitation for Aggravated Assault, Helman received an additional sentence of no less than two-and-a-half (2 ½) nor more than five (5) years, to run consecutively. Upon Criminal Information No. 0343-2015, Helman's aggregate sentence was five (5) to ten (10) years imprisonment, which was to be served consecutively to No. 2950-2014. *See* N.T. 6/15/15, 116-117.

Therefore, Helman's total sentence for both cases was no less than twenty (20) but no more than forty (40) years imprisonment.

In imposing these sentences, this Court stated as follows:

> "When I first heard of this and was made aware of the facts of the principal case – the delivery of the Ricin to Jake Palm – I heard certain facts which are almost incomprehensible. For example, you walked eight miles from your home to Jake Palm's home, and then back. You were able, through the Internet, to obtain Castor Beans, which you ground up. You were able to obtain the chemicals needed from the Internet to manufacture the product. You even went so far as to obtain a "scratch-and-sniff" birthday card. This showed some planning, some premeditation, a fixed focus, diligence, all to cause (the) death to Jacob Palm.
>
> Now, your attorney has stated, and he's absolutely correct, that I should take into account that no one was physically harmed here. It's true. Jacob Palm is alive. He has emotional scars, and perhaps psychological scars, but his life has been spared. And when we also look at the other persons involved in this case, Kelsey Evans has not been physically harmed, other than the emotional trauma which occurred, and that's a factor to consider.
>
> Looking at the second case, we see your focus was directed at a multitude of people, but we can gather from what we hear that you were especially fixed upon the prosecutor, Antonetta Stancu, and the Detective, Detective Schlotter, who investigated and brought the case to the fore. Again, they were never harmed nor injured. We take that into account. N.T. 6/15/15, 97-99.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

5

Yes, we take into account that no one is dead and no one has been injured. We have to counter-balance that with your intent. You intended – there can be no mistake – that Jake Palm inhale that birthday card. It was admitted and submitted at the prior hearing that the dose of Ricin was fatal; that it was more than sufficient to cause death. N.T. 6/15/15, 100.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

But we have to consider that this would have been more than catastrophic if it were not for your co-worker at Target. She probably heard you, for a long time, complaining and venting about your broken relationship. She gave you a listening ear. You confided in her to the point where prior to your arrest you even tell her that you are taking care of your problem, and you mention that this will all be over, implying that Jacob Palm would be out of the picture.

Now, many people, having heard that, would say that's just talk. No one would act upon that purpose. No one would seriously consider killing someone by poisoning them, lying in wait, a plot. Instead, I assume, upon further consideration, she says to herself, maybe he really means it. He is distraught over the break-up of his relationship...and maybe, just maybe, he's telling the truth. So she exercises impeccable judgment and she contacted the police. So if there is a heroine in this equation, it isn't so much the prosecution by the police, because we expect the finest from them, but it's Samantha Heil who did the right thing here. I will say, had she not, this would have been beyond imagination as to the damage which could have occurred." N.T. 6/15/15, 100-102.

We then addressed the testimony of Dr. Allan Tepper, who testified as to the cognitive and psychological conditions of Helman. We found that Dr. Tepper's testimony supports our finding that Helman had the cognitive skills to engage in "clear planning to see an endeavor through to its conclusion." N.T. 6/15/15, 102. We also took note of Dr. Tepper's belief that Helman would benefit from mental health treatment. N.T. 6/15/15, 103.

This Court continued:

"We also have to give credence to the fact that other than this, you have no prior record. The Sentencing Guidelines reflect that.

Sometimes we see people who come before us who are almost irredeemable. We see they have been to the courts many times and they have not figured out how to conform their conduct to the law. They have not figured out what their actions can produce, and therefore, we consider

6

them incapable of any real resolution or rehabilitation. They are the career criminals. Fortunately, we do not see many of them.

You're just the opposite. From what I heard, from what I saw from both this case and the prior case, you are bright. You are articulate. You're responsive. But I don't think you appreciate, Mr. Helman, the damage that you caused to people very close to you. Forget Kelsey Evans, and let's take Jake Palm out of the mix. Samantha Heil was traumatized. N.T. 6/15/15, 103-104.

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

You could have been facing multiple counts of First Degree Murder. One of the classic hallmarks of First Degree Murder is an intentional, deliberate, willful killing requiring some premeditation, some plan. One of the examples they cite is lying in wait or poison. You did them both.

It could have been an absolute nightmare for so many people, and again, fortunately, it was not. N.T. 6/15/15, 105-106.

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

I have to look at every facet. We don't just sentence for offenses. We sentence the defendant. He is unique. What do we see about Nicholas Helman? It's clear he has some mental, and emotional, and psychological problems. It's palpable. Just as clear is the fact that he needs some treatment.

We credit the fact that he does not have an adult criminal record. We also consider, on the other side of the equation today, even though they are first offenses, they are multiple convictions, and these offenses, especially placing the Ricin in the card, is egregious and more significant than we usually see.

Can we conclude that you were only a danger to Jacob Palm? On one hand, we could, but we are also aware of the fact that you left it there, and that persons other than Jacob Palm could have touched it, come into contact with it, [and] disseminated it. So, yes, you were dangerous to your own family, by implication, but most directly, to anybody who came into contact with that letter you delivered, and at great cost to remediate the situation." N.T. 6/15/15, 109-110.

This Court then imposed the sentences outlined above. After imposing the sentence, Helman was addressed a final time.

"[I]f you add those numbers, Mr. Helman, they sound extraordinary, and they are. Please understand, your offense was extraordinary. We don't see

7

this type of thing every day. You're a young man. It seems bleak for you, and of course for your family, and in all likelihood, some day you will be paroled. I hope that happens, but only when you have received sufficient treatment from this system where you can understand what affected you, and hopefully someday, at the conclusion, you'll be released upon parole and be a productive citizen. [B]ut right now, in June of 2015, I consider you a serious danger to others and to the community." N.T. 6/15/15, 117-118.

In response to Dr. Tepper's testimony regarding mental health treatment, we recommended that Helman's sentence be served at the State Correctional Institute at Retreat in Luzerne County. There, he would be more likely to receive individualized treatment. Additionally, we noted that this facility has a strong therapeutic mental health program within the State Penitentiary system. We also considered Helman's age in making this recommendation, as Retreat's programs accommodate youthful offenders. N.T. 6/15/15, 114.

On October 6, 2015, a hearing was held in response to Helman's Motion to Reconsider Sentence. Both the Commonwealth and Helman's counsel agreed that the sentence for Aggravated Assault on Criminal Information No. 2950-2014 should merge with the sentence for Attempted Murder. Therefore, the sentence for Aggravated Assault was vacated. The new aggregate sentence in Case No. 2950-2014 was therefore imposed as no less than ten (10) nor more than twenty (20) years imprisonment

The remaining issues on the Motion to Reconsider for No. 0343-2015 was denied, and we imposed a total aggregate sentence for both cases of no less than fifteen (15) and no more than thirty (30) years imprisonment.

On October 30, 2015, Helman filed this appeal. Helman raises the following sole issue, *verbatim*:

> "Did the sentencing court err in imposing consecutive sentences resulting in an aggregate sentence that was **unduly harsh** considering: the nature of the crimes (no one was physically injured), the Appellant's age (he was 19 years of age at the time of his arrest in 2014), the Appellant's lack of criminal history, the Appellant's rehabilitative needs, and the length of his

8

incarceration?" (Appellant's Statement of Matters Complained of on Appeal, 11/18/2015) (emphasis added).

It is well-settled that judges are offered broad discretion in fashioning what they deem to be an appropriate sentence. An appeal will be granted only if the reviewing court finds that there is a *substantial question* that the sentence was not appropriate under the Sentencing Code.

When determining whether appellant's contentions raise a substantial question, the reviewing Court will analyze each appeal on a case-by-case basis. "[The court] will grant an appeal only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." Commonwealth v. Brown, 741 A.2d 726, 735 (Pa. Super. 1999) (en banc).

Sentencing a defendant to consecutive sentences is at the discretion of the sentencing judge. Generally a challenge to the imposition of consecutive sentences does not raise a substantial question appropriate for appellate review. Pennsylvania courts have held that a substantial question will only arise in "the **most extreme circumstances**, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment." Commonwealth v. Lamonda, 52 A.3d 365, 372 (Pa. Super. 2012) (emphasis added). When making this determination, the Court will address "whether the decision to sentence consecutively raises the aggregate sentence to, what appears upon its face to be, an excessive level in light of the criminal conduct at issue in the case." Commonwealth v. Prisk, 13 A.3d 526, 533 (Pa. Super. 2011).

Here, Helman's aggregate sentence for both cases is no less than fifteen (15) to no more than thirty (30) years imprisonment. We also recommended that his sentence be served at a facility specializing in individualized mental health treatment.

9

According to Helman's Concise Statement of Matters Complained of on Appeal, he is not challenging the legality of the sentence, but rather this Court's decision to impose the sentences consecutively on certain counts rather than concurrently.

As previous cases have indicated, a substantial question regarding imposition of consecutive rather than concurrent sentences will only arise in extreme circumstances, where the aggregate sentence is excessive in the light of the criminal conduct at issue.

As a point of comparison, the statutory maximum sentence for Attempted Murder is twenty (20) years imprisonment. Therefore, Helman's consecutive sentences upon No. 2950-2014 do not exceed what is a statutory permissible sentence for Count 1 alone. Helman also was sentenced for Risking a Catastrophe, Stalking, and Harassment in that case.

For further comparison, Helman's sentence for No. 0343-2015 of five (5) to ten (10) years does not exceed the statutory permissible sentence for Criminal Solicitation of Aggravated Arson. Helman also was sentenced for Criminal Solicitation of Aggravated Assault in that case.

In light of the possible maximum sentences, it is clear that choosing to sentence Helman to consecutive sentences, creating an aggregate sentence within the statutory maximum for the first two counts in each case alone, is not excessive in light of the criminal conduct presented. This Court stressed at length the important considerations in sentencing Helman, including his lack of a prior criminal record, which was already considered when determining the appropriate sentence under the Sentencing Guidelines. We also considered the potential grave catastrophe to many individuals had Helman's plan come to fruition.

The fact that "no one was physically injured," and Helman's age and lack of prior criminal record, were carefully addressed. We also stressed that it was apparent that Helman should receive mental health treatment, if available, and although this court cannot stipulate the place of incarceration within the State Correctional System, we urged consideration of a therapeutic environmental addressing his specific emotional and psychological needs.

10

We believe that the nature of Helman's crimes, and the potential catastrophic results, combined with his planning and premeditation, were such as to warrant the sentence we imposed. A lesser sentence would have clearly depreciated the gravity of Helman's crimes.

Based upon our discussion regarding the factors present in determining Helman's sentence, in conjunction with the statutory permissible sentences, it is clear that Helman's appeal does not contain a substantial question, and therefore his appeal should be denied.

BY THE COURT:

DATE: 12/3/15

ALAN M. RUBENSTEIN, J.

**COPIES SENT TO:**

**Robert James, Esq.**
Chief Deputy District Attorney
DISTRICT ATTORNEY'S OFFICE
100 N. Main Street
Doylestown, PA 18901

*Attorney for Plaintiff/Appellee*     COMMONWEALTH OF PENNSYLVANIA

**Joseph S. Haag, Esq.**
Chief Deputy Public Defender
PUBLIC DEFENDER'S OFFICE
100 N. Main Street
Doylestown, PA 18901

*Attorney for Defendant/Appellant*     NICHOLAS TODD HELMAN

**Joseph D. Seletyn, Esq.**
Prothonotary
SUPERIOR COURT OF PENNSYLVANIA
530 Walnut Street, Suite 315
Philadelphia, PA 19106